**IN THE COURT OF APPEALS OF IOWA**

No. 24-1085
Filed September 4, 2024

**IN THE INTEREST OF M.J.,**
**Minor Child,**

**A.A., Mother,**
    Appellant,

**J.J., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, Judge.

Parents separately appeal the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Alexander S. Momany of Howes Law Firm, PC, Cedar Rapids, for appellant mother.

Michael M. Lindeman of Lindeman Law, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Julie F. Trachta of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered by Schumacher, P.J., Sandy, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BOWER, Senior Judge.**

Parents separately appeal the termination of their parental rights to their child, born in 2021. Both challenge the statutory grounds for termination. The mother further claims termination is not in the child's best interests due to the bond she shares with the child and requests additional time to work toward reunification. Upon our review, we affirm both appeals.

## I.      *Background Facts and Proceedings*

This family came to the attention of the Iowa Department of Health and Human Services in January 2023, upon concerns of substance use by the parents and the parents threatening each other with a firearm. The father and the child tested positive for cocaine. The child was adjudicated in need of assistance and removed from the father's care but remained in the mother's care under the department's protective supervision. In addition to substance-use treatment, the parents were ordered to participate in couples therapy and mental-health treatment.

The father completed substance-use treatment but relapsed on cocaine almost immediately thereafter. He tested positive for cocaine twice in June but denied use. The visitation provider raised concerns about an incident during which the father was at the home with the mother before the provider arrived, despite his visitation being fully supervised. The provider also felt uncomfortable being in the home due to the parents' "disrespectful and rude" comments toward her. Meanwhile, the mother exhibited "paranoid behavior" and accused the department of "hiring a person to drive by the home." The department ordered protective daycare for the child, but the mother was not comfortable with anyone else caring

for the child. In an August report, the guardian ad litem (GAL) opined "if there continues to be concerns regarding [the father] being in the home or around [the child] when not approved or concerns regarding [the mother's] decision-making regarding [the child]'s safety or supervision, I would support removal from [the mother]'s care as well."

In October, the State filed an application requesting the child's removal from the mother's custody following the child's admission to the emergency room after ingesting the maternal grandmother's blood pressure medication. The mother reported the grandmother was "supposed to be supervising" the child, despite the mother's prior statements the grandmother was "not able to adequately supervise the child." The mother told emergency room staff the father was incarcerated, which was untrue. The State further alleged the mother "was exhibiting 'strange' behavior while in the [emergency department]"; "was reported to be verbally aggressive; was on her phone more than paying attention to [the child]; was exhibiting symptoms of mania; and was 'mocking' [the child] because [the child] wanted to be breast fed." According to the State, "Lack of supervision has been a consistent and recurring concern in this case. In fact, the court has ordered protective daycare, and the mother has yet to comply with this order." The court granted the State's application, removed the child from the mother's custody, and placed the child in the care of a maternal aunt and uncle.[1]

In November, the department reported the parents announced they were engaged to be married, but they were not consistently attending couple's therapy.

---

[1] The child was later transferred to "another relative placement" due to "[c]ontinued conflict between [the mother] and her sister."

The department noted concerns with the parents denying any issues in their relationship despite a history of domestic-violence service calls. The department also noted concerns about the parents arguing in the child's presence, "which has upset [the child]." In February 2024, the mother began participating in domestic-violence counseling.

In March, the department noted, "There continues to be ongoing toxicity within [the parents'] relationship, resulting in the Department separating their case plan expectations despite their relationship status. Because of this[, a]t parents' request, they will be completing interactions separately. This continues to be a work in progress." The GAL similarly reported, "The parents' relationship is of significant concern as it has a very direct impact on [the child]'s physical and emotional safety." The GAL also expressed concerns relating to the mother's aggressive and volatile behavior:

> [M]ultiple medical professionals have expressed concerns regarding [the mother]'s attitude, speech, and behaviors toward [the child]. [The mother] has lost employment opportunities, roommates, and has put [the child]'s ability to maintain services at risk due to instigating conflict and accusations. It is even more concerning she would do so in public, at a medical facility. If [the mother] would engage in this behavior in public around medical professionals, it creates concern about what happens when no one else is around.

In April, the mother tested positive for cocaine. The mother reported she had "never used drugs in her life, then in the same conversation reported that she is eight years sober." The next month, the father again tested positive for cocaine but denied use.

The State initiated termination-of-parental-rights proceedings. The termination hearing took place in June. The department caseworker testified that

throughout the case, the mother had struggled with mental health and lack of stability, but she was neither "active" nor "engaged" in therapy. The caseworker reported the father had struggled with substance use throughout the case, acknowledging he "was able to demonstrate a period of sobriety, but as of recent he has been testing positive again for cocaine." She stated there were also concerns about the instability of the parents' relationship, the status of which was "constantly changing." Meanwhile, the child was "do[ing] well in her current placement." The department and GAL recommended termination of parental rights.

The court thereafter entered an order terminating both parents' rights pursuant to Iowa Code section 232.116(1)(h) (2024). The mother and father separately appeal.

## II.     Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). Upon our review, our primary consideration is the best interests of the child, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the child's safety and need for a permanent home, *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III.    Analysis

*A. Grounds for Termination.* The mother and father both challenge the sufficiency of the evidence supporting the grounds for termination cited by the juvenile court. They claim the State failed to show by clear and convincing evidence the child could not be returned safely to their respective custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4).

Within the two months prior to the termination hearing, both parents tested positive for cocaine. Neither admitted use. The father had repeatedly tested positive for cocaine throughout the case, including before and after his successful completion of treatment. He then completed a second substance-use evaluation, which recommended no treatment, but the provider opined the father was "not honest on the evaluation." The father completed a third evaluation at a church. He reported attending weekly groups, but the department was not able to verify his attendance because the father reported "other members in his group were unwilling to verify that attendance." This record provides no basis to find the father has addressed his substance use, and therefore, the child cannot return to his custody at this time. *See In re A.B.*, 815 N.W.2d 764, 776 (Iowa 2012) ("We have long recognized that an unresolved, severe, and chronic drug addiction can render a parent unfit to raise children.").

Relating to the mother, her denial of substance use after testing positive in April was questionable, particularly in light of the department's concerns about her lack of honesty during the case. In that vein, we disagree with the mother's claim that she "had predominantly followed through with recommendations and accomplished the goals expected of her." The mother had not addressed concerns relating to her relationship with the father, and by extension, the child's exposure to their discord. As the caseworker testified, "They will escalate into arguments very quickly that involves yelling. There is a history of it becoming physical. [The child] typically gets very upset when her parents argue in front of her." Concerns also remained about the mother's lack of honesty about her contact with the father. As the GAL reported, "The parents have admitted that suspicions about their lack

of honesty were accurate, in that they were living together at [the mother]'s home for several months and were being dishonest about their situation and their relationship." And with regard to the mother's complaint her visitation had not progressed beyond fully supervised, the caseworker explained visits had not progressed because "[t]here were concerns for her mental health and her ability to remain appropriate at interactions."

Based on these and other facts replete in the record (including unaddressed mental-health concerns), we agree with the court's finding the child could not be returned to the custody of either parent at the time of the termination hearing. Iowa Code section 232.116(1)(h) was satisfied.

*B. Best Interests.* When determining best interests, we give primary weight to "the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). Here, these factors all weigh in favor of termination. We agree with the court's analysis on this point:

> It is in the best interest of [the child] for parental rights to be terminated. Her parents have worked with services for approximately seventeen months without significant change in the area of concern. Perhaps the outcome would have been different if [the parents] had actually used the services and made a good faith effort to use[] the skills acquired to address their relationship issues, mental health, and substance abuse. The behaviors [the child] has been demonstrating over the recent months prior to trial clearly indicate that she is in need of permanency and stability. Her parents are not able to show that they can provide a stable, substance and violence free environment for her. She does not deserve to wait for this until such time as her parents may decide to make her a priority in their lives.

*C. Exceptions to Termination.* The mother claims termination is not in the child's best interests because "the child was intensely bonded to [the mother] in

this case." "Consideration of the parent-child bond is not a part of our best-interests analysis." *In re E.S.*, No. 23-0590, 2023 WL 4104126, at *2 (Iowa Ct. App. June 21, 2023). However, section 232.116(3)(c) allows the court to forgo termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Indeed, the caseworker testified to the bond between the mother and the child, and she noted the mother "consistently attended interactions with [the child]," which were "generally positive." However, the child was also "very attached to her [current] caregivers." The court addressed this exception, stating, "in making this decision" to terminate parental rights, it had "considered the trauma caused by the termination of parental rights, but [found] that risk of continued harm in the parents' care, and [the child]'s need for permanency, greatly outweigh[ed] this trauma." We also decline to exercise a permissive exception based on this factor.

*D. Additional Time.* "[I]n the alternative," the mother requests a six-month extension "to work towards reunification." To grant an extension of time for reunification, the court must "enumerate the specific factors, conditions, or expected behavioral changes" providing a basis to determine the child will be able to return to the parent at the end of the additional six months. Iowa Code § 232.104(2)(b). Here, the caseworker testified the mother was unable to "demonstrate long-term stability with her mental health," "her relationship with [the father]," or her "ability to parent [the child] independently on her own." The caseworker did not believe "anything will change if [the mother] is granted more time." "We look to the past for indicators of what is likely to occur in the future." *In*

*re M.P.*, No. 19-0995, 2019 WL 5063337, at *5 (Iowa Ct. App. Oct. 9, 2019). The court found, "The dishonesty and lack of accountability on the part of both [parents] make it clear that an additional period of services will not alter the outcome." On this record, the court had no basis on which to grant an extension.

We affirm the termination of the parental rights of both parents.

**AFFIRMED ON BOTH APPEALS.**